**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEBRA BLAIR, | ) | CASE NO. 1:16CV01019 |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SOLOMON OLIVER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Debra Blair ("Plaintiff"), challenges the final decision of Defendant, Nancy A.

Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications

for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under

Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for

preparation of a Report and Recommendation.  For the reasons set forth below, it is

recommended that the Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I.   PROCEDURAL HISTORY

On June 14, 2011, Plaintiff filed applications for DIB and SSI alleging a disability onset date of April 1, 2011 and claiming she was disabled due to diabetes mellitus, neuropathy, arthritis, asthma, chronic diarrhea, vision problems, thyroid condition, high blood pressure, and high cholesterol.  (Transcript ("Tr.") 333-343, 412).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 233-34).

On July 8, 2013, an ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 36-71).  On August 9, 2013, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 173-187).  Plaintiff filed a Request for Review of the ALJ's decision on August 22, 2013.  (Tr. 268).  On October 29, 2014, the Appeals Council vacated the ALJ's decision and remanded for rehearing.  (Tr. 194-197).  The Appeals Council ordered that upon remand the ALJ obtain additional evidence of Plaintiff's impairments and give further consideration to Plaintiff's maximum residual functional capacity and provide rationale with specific references to the record in support of assessed limitations.  (Tr. 195-96).

A second hearing was held on March 25, 2015.  (Tr. 14-28).  Plaintiff and a vocational expert appeared and testified.  On April 23, 2015, the ALJ issued a decision finding Plaintiff was not disabled.  (Tr. 11-35).  The ALJ' s decision became final on March 17, 2016, when the Appeals Council declined further review.  (Tr. 1-4).

2

On April 28, 2016, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.).  The parties have completed briefing in this case.  (Doc. Nos. 13, 15).  Plaintiff asserts the following assignments of error:

> (1)  The ALJ erred in weighing and in rejecting the opinions of Pamala Murphy, M.D., Plaintiff's treating physician; and

> (2)  The ALJ erred by failing to consider Plaintiff's alleged noncompliance with recommended medical treatment in accordance with SSR 82-59.

(Doc. No. 13).

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born on May 25, 1954 and was sixty years old at the time of the ALJ's April 2015 decision.  (Tr. 333).  She is a high school graduate with some college, and she is able to communicate in English.  (Tr. 89).  Plaintiff has past relevant work as a unit clerk, cashier, reservations clerk, and hair stylist.  (Tr. 88-90).

### B.   Medical Evidence

On September 15, 2010, Plaintiff presented to primary care physician Pamala Murphy, M.D., complaining of pain, numbness, tingling, heaviness, and swelling in her legs.  (Tr. 783).  Plaintiff reported that it hurt to walk.  (*Id.*).  Dr. Murphy noted a diagnosis of diabetic neuropathy.  (*Id.*).  Plaintiff was noncompliant "most of the time" with her diabetes medication; and noncompliant "some of the time" with her diabetic diet.  (*Id.*).

Plaintiff was seen by Wilfredo M. Paras M.D. for a consultative examination on January 11, 2011.  (Tr. 693).  According to Dr. Paras's note, Plaintiff was diagnosed with diabetes mellitus in 1996.  (*Id.*).  She was being treated with blood sugar pills, but more recently had been

3

prescribed insulin.  (*Id.*).  Diabetic retinopathy was noted.  (*Id.*).  Plaintiff reported intermittent

tingling and numbness in the tips of her fingers and toes and constant numbness in her legs and

feet.  (*Id.*).  Dr. Paras also noted chronic bronchitis, obesity, and arthritis in the knees, with the

right worse than the left.  (*Id.*).  On examination, Dr. Paras found distal pulses in both legs

reduced; deep tendon reflexes reduced bilaterally; and reduced range of motion in the lower back

and right shoulder.  (Tr. 694).  Plaintiff walked and moved slowly without an assistive device.

(*Id.*).  An x-ray of the right knee showed minimal narrowing involving the knee and

patellofemoral joint spaces and a spur at insertion of the quadriceps tendon onto the patella.  (Tr.

695).

Dr. Paras noted that Plaintiff's diabetes mellitus appeared to be in fairly good control;

that her diabetes related symptoms mostly consist of peripheral neuropathy; that her

hypertension and hypothyroidism appeared to be in good control with medication; and that

morbid obesity is probably one of her major problems as it especially affects her arthritis.  (Tr.

694).  Dr. Paras concluded that appeared to be limited to sedentary work.  (*Id.*).

Plaintiff was seen by Dr. Murphy on April 13, 2011.  Dr. Murphy noted that Plaintiff was

noncompliant with her diabetes medication most of the time, and she was noncompliant with her

diabetic diet some of the time.  (Tr. 746).  Plaintiff complained of three loose stools a day and

pain in the bottoms of her feet.  (Tr. 746).  Diagnoses included obesity, hyperlipidemia,

ostearthritis of the knee, peripheral diabetic neuropathy; obstructive sleep apnea, and diabetic

neuropathy.  (Tr. 748).  Plaintiff continued with Gabapentin.  (*Id.*).

On April 28, 2011, Plaintiff presented to a podiatrist, Mark Hardy, D.P.M, complaining

of foot pain, numbness in her toes, and swelling in her feet.  (Tr. 739-40).  Dr. Hardy noted

4

diminished sensation to light touch and diminished protective sensation.  (Tr. 742).  Dr. Hardy also observed edema of the bilateral feet and ankles and hyperpigmentation of the bilateral lower extremities consistent with venous stasis.  (Tr. 743).  Diagnoses consisted of diabetes mellitus, neuropathy, and venous stasis.  (Tr. 743).  X-rays of Plaintiff's feet revealed mild to moderate degenerative changes in the first metatarsal pharyngeal joint; mild degenerative changes in the mid-foot of both feet; and spurs on the calcaneus of both feet.  (Tr. 832).  A slight worsening was noted compared to the prior study.  (*Id.*).

Plaintiff spoke to a nurse on May 2, 2011 about management of her diabetes.  The nurse's note indicated that Plaintiff was not eating on time and she forgot to take her second dose of medication for most of the week.  (Tr. 738).

On May 12, 2011, Plaintiff had an eye examination.  (Tr. 734).  A previous diagnosis of moderate diabetic non-proliferative retinopathy was noted.  (*Id.*).

On June 8, 2011, Plaintiff presented to a nurse practitioner, Fiona B. Ju.  (Tr. 717-20).  Nurse Ju noted diagnoses of uncontrolled diabetes with neurological manifestation.  (Tr. 717).  Plaintiff was seeking a doctor's excuse for three or four months due to neuropathic pain in her feet.  (Tr. 719).   There is documentation of "medication compliance issues," and Plaintiff reported that she "sometimes forget[s] to take her medication."  (Tr. 720).  Plaintiff was told to follow up with Dr. Murphy.  (Tr. 719).

During a phone encounter on June 16, 2011, Plaintiff reported to a nurse that she last filled her three month supply of diabetic medication sixth months earlier in January 2011.  (Tr. 716).  The nurse emphasized the importance of compliance with medication and diet.  (*Id.*).

5

On June 27, 2011, Plaintiff presented to her primary care physician Dr. Murphy with complaints of thumb pain and bilateral foot and leg pain.  (Tr. 710).  Plaintiff reported constant tingling and numbness over the previous six months.  (Tr. 711).  She stated that "it hurts to walk."  (*Id.*).  Plaintiff also complained of knee pain and low back pain.  (*Id.*).  On examination, Plaintiff appeared to be in mild to moderate pain with antalgic gait; the lumbosacral spine area had no local tenderness or mass; the lumbosacral spine had painful and reduced range of motion; and  bilateral straight leg raising was negative.  (Tr. 712).  Plaintiff's deep tendon reflexes, motor strength, and sensation were all normal, including her heel to toe gait.  (Tr. 712).  A knee exam showed bilateral positive for moderate crepitations and some mild tenderness and pain on range of motion.  Plaintiff had trace edema of her legs, hyperpigmentation of skin, and decreased sensation of the feet.  (*Id.*).  Diagnoses of uncontrolled diabetes with neurologic manifestations, trigger thumb, carpal tunnel syndrome were noted, and degenerative disc disease of the lumbar spine.  (Tr. 712-13).

Plaintiff presented with an infected sebaceous cyst on September 14, 2011.  (Tr. 1512).  The nurse deferred a blood pressure check at that time, because Plaintiff had not been taking her blood pressure medication and because she was in pain.  (Tr. 1512).

Plaintiff spoke to a nurse about her diabetes care management on September 20, 2011, and the nurse indicated that Plaintiff had not refilled her insulin prescription.  (Tr. 843).

On October 17, 2011, Plaintiff presented to Dr. Murphy, complaining of lumps in her legs and trigger finger in her thumb.  (Tr. 841).  Plaintiff reported that she did not have the money to pay her co-pays for physical therapy.  (*Id.*).  Dr. Murphy noted diagnoses of trigger finger, knee pain, and diabetic neuropathy.  (*Id.*).

6

Plaintiff was seen by a podiatrist on October 31, 2011.  (Tr. 961).  She reported that she did not take her Gabapentin regularly or as prescribed.  Instead, she reported taking individual doses in anticipation of pain.  (*Id.*).

Plaintiff had a phone encounter with her nurse practitioner Ms. Ju on November 3, 2011. (Tr. 907).  Ms. Ju noted that there had been medication compliance issues.  (*Id.*).  She discussed the importance of following the treatment plan exactly as directed in order to achieve a good medical outcome.  (*Id.*).  Plaintiff reported, "sometimes I forget to take my medication."  (*Id.*).

Plaintiff presented for an initial visit with Jaime Sabogal, M.D. on November 8, 2011. (Tr. 904).  Plaintiff complained of pain and locking in her thumb.  (*Id.*).  Dr. Sabogal administered a cortisone injection.  (Tr. 905).

On November 15, 2011, Plaintiff presented to her podiatrist, complaining of continued digital pain; pain, burning, tingling, and numbness of feet and hands; and swelling of the feet and ankle.  (Tr. 899).  The podiatrist noted that Plaintiff did not take her Gabapentin consistently or as prescribed.  (*Id.*).  A diagnosis of diabetic peripheral neuropathy was noted.  (Tr. 900).  The podiatrist concluded that Plaintiff was a low risk for foot complication.  (*Id.*).

On November 17, 2011, Plaintiff spoke with a nurse about her diabetes care management.  (Tr. 897).  The nurse's note indicates that Plaintiff had no routine time for eating and that Plaintiff seldom checked her blood sugar.  (Tr. 897).

On November 18, 2011, Plaintiff presented for an orthopedic consultation with Josephine Fernando, M.D.  (Tr. 894).  Plaintiff complained of constant, dull low back pain that radiated to her left thigh and knee.  (Tr. 894-95).  And she reported mild difficulty ambulating due to an osteoarthritic knee.  (Tr. 895).  On examination, Dr. Fernando noted marked limitation of flexion

7

and extension; strength equal bilaterally; antalgic gait; pedal edema; mildly limited hip range of motion, with the right worse than the left.  (*Id.*).  Straight leg raising was negative.  (*Id.*).  Diagnoses consisted of hip pain, obesity, and lumbar degenerative disc disease.  (*Id.*).

An x-ray showed multilevel degenerative changes of the lumbosacral spine with endplate spurring and disc space narrowing.  (Tr. 930).  An x-ray of the pelvis showed generalized osteopenia; mild to moderate degenerative changes of both hips; and degenerative changes of the lumbar spine.  (Tr. 931).  X-rays of the knee revealed mild osteoarthritis.  (Tr. 932).

Notes of a phone encounter from November 28, 2011 show that the nurse had a long discussion about Plaintiff's meal plan again and that Plaintiff did "not believe the instruction." (Tr. 893).  Notes of a diabetes management call from December 11, 2011 indicate some improvement.  (Tr. 891).  Plaintiff was having difficulty eating more often, but "she can see the differen[ce]."  (*Id.*).

On February 8, 2012, Plaintiff was seen by Harvey Lester, M.D. for an ophthalmology consultation.  (Tr.1297).  Dr. Lester diagnosed diabetic retinopathy in both eyes.  He indicated that while visually impaired, Plaintiff could work but only in "safe conditions."  (Tr. 1289).

Also on February 8, 2012, Plaintiff presented to her primary care physician Dr. Murphy, complaining of exacerbation of asthma for 30 days.  (Tr. 1219).  Plaintiff reported mild wheezing; nasal blockage; and productive cough.  Plaintiff indicated that she was noncompliant with her asthma medications.  (*Id.*).

On February 24, 2012, the nurse's notes show that Plaintiff was not taking Simvastatin as prescribed, and that she skipped dinner and experienced a hypoglycemic episode.  (Tr. 1232). On March 28, 2012, it was reported that she had been taking all of her medications properly.

8

(Tr. 1378).  On May 16, 2012, Dr. Murphy wrote a doctor's note for Plaintiff, stating that she "has not been able to work because she has chronic pain from diabetic neuropathy, osteoarthritis of her hips, feet and knees, and degenerative disc disease of her lumbar spine.  She also has diarrhea and needs assistance with using the toilet."  (Tr. 1674).

On June 19, 2012, nursing notes show that Plaintiff was compliant with medications most of the time, but that she did not titrate her dose of insulin as instructed; and that she was skipping meals and not eating on time.  (Tr. 1687).  The nurse indicated that Plaintiff had limited knowledge of diabetes management.  (*Id.*).  Notes generated on August 30, 2012 also indicate that Plaintiff was compliant with medications most of the time, but that she forgot to take a second insulin injection 1-2 times per week.  (Tr. 1718).  She also failed to titrate her dose of bedtime insulin from 48 to 58 units the previous week.  (*Id.*).

On August 22, 2012, Plaintiff presented in the emergency department with complaints of nausea, vomiting, and dizziness.  (Tr. 1703).  A chest x-ray showed pneumonia.  (Tr. 1712).  Plaintiff was admitted to the hospital.

Plaintiff was seen by Dr. Fernando on September 7, 2012.  (Tr. 1729-30).  Dr. Fernando reviewed an MRI of Plaintiff's lumbar spine, noting multilevel degenerative disc disease and moderate neural foraminal stenosis.  (Tr. 1730).  Plaintiff was referred to pain management.  (Tr. 1730).  A pain management specialist saw Plaintiff on October 31, 2012.  (Tr. 1765).  Plaintiff gave a history of chronic pain and rated her pain an eight out of ten, which worsened with prolonged activity.  (*Id.*).  Plaintiff reported that physical therapy had not helped.  (*Id.*).

On October 8 and 29, 2012, Plaintiff continued to have compliance issues with both medication and diet.  (Tr. 1758, 1763).  Plaintiff and her nurse had a long discussion regarding her insulin dose.  (Tr. 1763).

On October 31, 2012, Plaintiff appeared to be "well" and "in no apparent distress" on physical examination.  (Tr. 1772).  She was alert and oriented, pleasant and cooperative.  She had antalgic gait and ambulated without help.  (*Id.*).

Notes dated September 20, 2012 show improvement of Plaintiff's non-proliferative diabetic neuropathy, as Plaintiff's glucose control had improved.  (Tr. 1742).  However, doctor's notes dated January 15, 2013 indicate was again having compliance issues. (Tr. 1804-06).  On January 24, 2013, Plaintiff had been following the instructions on her insulin bottle and taking the medication as prescribed.  (Tr. 1810).  Plaintiff reported feeling better.  (*Id.*).  On February 18, 2013, nursing notes show continued compliance with her medications, although Plaintiff was still overeating.  (Tr. 1819).  Plaintiff reported that she had increased her exercise activity, walking around her work place.  (*Id.*).

 On April 2, 2013, Plaintiff underwent pulmonary testing.  (Tr. 1874-75).  Testing notes indicate "good effort and understanding.  Patient given aerosol treatment with unit dose Albuteral for 10 minutes.  Tolerated procedure well."  (Tr. 1875).  On April 16, 2013, Plaintiff was referred to hematology for mild anemia, macrocytosis, and elevated white blood count.  (Tr. 1903).  An April 2011 examination revealed improvement with Plaintiff's non-proliferative diabetic neuropathy since her glucose control had improved.  (Tr. 1842).

On June 17, 2013, Plaintiff was seen by her primary care physician Dr. Murphy.  (Tr. 2234).  Continued diabetic compliance issues were noted.  (*Id.*).

On March 19, 2014, Plaintiff visited the emergency department, complaining that she "pulled something." (Tr. 1939).  The injury reportedly occurred after "vigorous exercising," as Plaintiff recently began a training program." (*Id.*).  Right abdominal pain and hip pain were noted. (*Id.*).  Pain was worse with range of motion; better with rest and Aleve. (*Id.*).  The diagnosis was abdominal muscle strain. (*Id.*).

Treatment notes dated April 14, 2014 show Plaintiff seeing well with both eyes. (Tr. 1894).

A nurse's note dated October 8, 2014 indicates that Plaintiff was instructed how to check blood sugar, because Plaintiff had not followed them the last time. (Tr. 1975).

On October 26, 2014, Plaintiff presented at the emergency department complaining of right calf pain that began after walking on the treadmill. (Tr. 2053).  On October 29, 2014, Plaintiff was evaluated by a physical therapist. (Tr. 2077).

On November 11, 2014, Plaintiff presented to Dr. Murphy complaining of severe, achy pain above the right knee. (Tr. 2097).  Symptoms were reportedly aggravated by weight bearing. (*Id.*).  Hydrocodone and physical therapy reportedly provided mild relief. (*Id.*).  Objective findings consisted of obesity, degenerative joint disease, moderate crepitation of right knee, and some moderate tenderness and pain with range of motion of right knee. (Tr. 2057, 2096).

On November 14, 2014, Plaintiff presented to nurse practitioner Ju complaining of abdominal pain, reflux, and diarrhea. (Tr. 2114).  Plaintiff complained of five to six bowel movements a day. (*Id.*).  Nurse Ju indicated that Plaintiff's random onset of diarrhea and abdominal cramping was likely due to irritable bowel syndrom, intermettent rapid colonic

transit, and colonic spasm.  (Tr. 2119).  During a follow-up phone encounter, Plaintiff reported

that diarrhea had resolved and that her reflux had improved with Zantac.  (Tr. 2195).

On December 8, 2014, Plaintiff was seen by a physical therapist.  (Tr. 2344-45).  It was

noted that she independently ambulated 100 feet with an antalgic, shuffling gait, a short stride

length, and slow cadence, using a cane in her left hand.  (Tr. 2344).  It was noted that Plaintiff

required no assistance and was independent in her ability to transfer from sit to stand, stand to

sit, sit to supine, and supine to sit.  (*Id.*).  Plaintiff was reportedly unable to stand on one leg

without losing balance.  (Tr. 2345).

On December 17, 2014, Plaintiff presented to an orthopedic specialist, Laurel Beverley,

M.D., for a consultation on her bilateral knee pain.  (Tr. 2207).  Plaintiff reported that she had

worked as a teacher's assistant but that she cannot walk anymore due to neuropathy.  (Tr. 2217).

Plaintiff reported that she was trying to work out using Zumba and a treadmill.  (*Id.*)  Plaintiff

reported pain and swelling of the right knee the day after exercising.  A cortisone injection

reportedly did not help.  The left knee reportedly began to hurt more since Plaintiff was limping

to protect the other knee.  (*Id.*).

On examination, Dr. Beverley noted Plaintiff was in no acute distress.  (Tr. 2218).

Plaintiff was cooperative but she required assistance to move onto the examination table.  (*Id.*).

Plaintiff wheezed when supine.  Plaintiff's gait was stiff-legged.  (*Id.*).  Tenderness was

described as maximal at lateral retinaculum, medial joint, and medial retinaculum.  (Tr. 2219).

Mild crepitus was noted.  (*Id.*).  A patello-femoral grind test was positive.  (*Id.*).  On examination

of the low back, Dr. Beverley noted tenderness to palpation with a positive straight leg raising

test.  (*Id.*).  Diagnoses consisted of osteoarthritis of both knees, morbid obesity, diabetes mellitus

12

(uncontrolled), stiffness of left hip joint, stiffness of right hip joint, lumbosacracl disc degeneration; lumbar radiculopathy, diabetic peripheral neuropathy, and psoriasis. (Tr. 2207).

Plaintiff was administered an injection in the bilateral knee. (Tr. 2219). It was recommended that she return the next week for another injection. (*Id.*). Plaintiff was not a candidate for knee replacement due to deconditioning, uncontrolled medical conditions, and severe obesity. (*Id.*).

**C.      Opinion Evidence**

**1.        Dr. Murphy**

On August 31, 2012, Dr. Murphy completed a functional capacity evaluation (FCE) of Plaintiff. (Tr. 1682-83). Dr. Murphy opined that Plaintiff was limited to lifting/carrying eight (8) pounds occasionally and five (5) pounds frequently; standing/walking for one (1) hour per workday, for fifteen (15) minutes at a time, due to multilevel degenerative disc disease with moderate neuroforaminal stenosis; and sitting for three (3) hours per workday, for one (1) hour at a time. Dr. Murphy opined that Plaintiff would require a sit/stand option at will and would require extra breaks during the workday. (Tr. 1683).

On March 7, 2013, Dr. Murphy completed another functional capacity evaluation of Plaintiff. (Tr. 1712-13). Plaintiff was limited to lifting/carrying five (5) pounds frequently and ten (10) pounds occasionally. (Tr. 1712). Standing and walking were limited to one-half hour in one (1) eight-hour work day, no more than ten (10) minutes at a time. (*Id.*). Dr. Murphy further opined that Plaintiff could occasionally reach or push/pull with her arms (Tr. 1713); that Plaintiff could rarely climb, balance, stoop, crouch, kneel, or crawl; that Plaintiff was prescribed a cane,

13

walker, and a breathing machine (*Id.*); and that Plaintiff required a sit/stand option at will and extra breaks during the work day.  (*Id.*).

On November 11, 2014, Dr. Murphy completed a third FCE of Plaintiff.  (Tr. 1882-83). Plaintiff was limited to lifting/carrying ten (10) pounds occasionally and five (5) pounds frequently.  (Tr. 1882).  Plaintiff was limited to standing/walking for one (1) hour total during an eight-hour workday, for no more than one (1) hour at a time.  (*Id.*).  Sitting was limited to one (1) hour a day, for no more than one (1) hour at a time.  (*Id.*).  Dr. Murphy further opined that Plaintiff could rarely climb, balance, stoop, crouch, kneel, or crawl.  (*Id.*).  Reaching and pushing/pulling were limited to occasionally.  (Tr. 1883).  It was noted that Plaintiff was prescribed a cane, wheelchair, and a CPAP machine for sleep apnea.  (*Id.*).  A sit/stand option was indicated, but extra breaks were not.  (*Id.*).

### 2.  Leanne Bertani M.D.

Dr. Bertani opined that Plaintiff was able to occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk (with normal breaks) for a total of four (4) hours; frequently push/pull with both lower extremities; occasionally climb ladders/stairs; never climb ladders/ropes/scaffolds; frequently balance, kneel, or crawl; and occasionally stoop or crouch.  (Tr. 155-56).  Dr. Bertani also noted that Plaintiff should avoid concentrated exposure to hazards.  (Tr. 156).

### 3.  Dr. Lester, M.D.

Consultative examiner Dr. Lester, an ophthamologist, opined that Plaintiff would be "able to work in safe conditions."

14

D.      **Hearing Testimony**

During the first hearing on July 8, 2013, Plaintiff testified to the following:

- Plaintiff stated that she quit her job at a call center due to medical problems. She had difficulty remaining seated, and she had pain in her hands when using the computer.  Consequently, she had a hard time keeping up with the pace of work.  (Tr. 51).

- Plaintiff had vision problems due to diabetic retinopathy.  Her vision became blurry after reading for about fifteen (15) or twenty (20) minutes.  (Tr. 57). Plaintiff had a driver's license, but she stopped driving about a year and a half earlier.  (Tr. 57).  To get around, Plaintiff's daughter would drive or she would use paratransit services.  (Tr. 57-58).

- She had pain in her legs, with the right worse than left (Tr. 59).  Plaintiff's daughter helped tie her shoes and put on socks.  (Tr. 59).  Plaintiff was able to button a blouse by herself.  (Tr. 58).  Sometimes her daughter helped her use the toilet.  (Tr. 62).

- Plaintiff estimated that she was able to sit for about fifteen (15) minutes before having to get up.  (Tr. 60)  She could walk fifteen (15) to twenty (20) steps before becoming short of breath.  (Tr. 60).  She could stand in place for about ten (10) minutes.  (Tr. 60).  Plaintiff grocery shopped using a power chair, but her daughter put her groceries away for her.  (Tr. 60, 62).

- Plaintiff used a rolling walker at the 2013 hearing, which had been prescribed by Dr. Murphy.  (Tr. 60-61).  Plaintiff had been using it for about four and a half months before the hearing.  (Tr. 61).  She used a straight cane for about a year before that.  Plaintiff used a CPAP machine to treat her sleep apnea, and she used a nebulizer for breathing treatments three times a week.  (Tr. 62).  She used her inhaler for her asthma daily.  (Tr. 62).

- Plaintiff's most comfortable position was lying down, and she did so for about two (2) hours at a time.  (Tr. 62-63).  Plaintiff said she had been compliant with her medications for the past six (6) to eight (8) months.  (Tr. 64-65).  Before that, she had had difficulty being compliant, noting that she had been homeless for a period of time and under a lot of stress as a result.  (Tr. 65).  During that time, she sometimes forgot to take her medications.  (Tr. 65).  Her medications made her sleepy, but otherwise she had no side effects. (Tr. 66).

During the second hearing on March 25, 2015, Plaintiff testified to the following:

15

- Plaintiff stated that she was still having symptoms from carpal tunnel syndrome (CTS) in both hands.  (Tr. 78).  There had been no discussion of surgery for the CTS by her doctors.  (Tr. 78).  She experienced pain, numbness, and tingling in her fingers.  (Tr. 79).  Plaintiff stated that she used wrist splints, mostly at night.  (Tr. 79-80).  Due to her symptoms, she dropped things such as her cordless phone and books.  (Tr.80).  She took pain medications as prescribed by Dr. Murphy for the CTS as well as for her other pain complaints.  (Tr. 80).

- Dr. Murphy had sent Plaintiff to physical therapy for her knee problems, but not for her CTS.  (Tr. 81).  Plaintiff testified that she was treated by Dr. Fernando for her back and by Dr. Beverly for her knees.  (Tr. 81).  Plaintiff experienced pain in both feet.  Her physicians had told her this was due to diabetic neuropathy.  (Tr. 84-85).

- She testified that she was compliant with her diabetes medications, and said that her doctors had not put her on a strict diabetic diet, but had just told her to limit herself to smaller portions. (Tr. 83).

- Plaintiff indicated that she could walk for only ten (10) to fifteen (15) minutes, using her cane for shorter distances and using a walker for longer distances.  (Tr. 85). She estimated that she could sit for about thirty (30) minutes and could lift about five (5) pounds.  (Tr. 86).  She did not believe that her medical problems would allow her to sustain a full-time work schedule at any sort of job (Tr. 88).

- Plaintiff testified once again that her daughter had to help her with most household chores, and occasionally helped with using the toilet.  (Tr. 82).  She again noted that she had graduated from high school, and indicated that she had taken some college coursework.  (Tr. 89).

The ALJ noted that Plaintiff had past relevant work as a unit clerk, cashier, reservations clerk, and hair stylist.  (Tr. 88-90).  The ALJ described the following hypothetical individual to the vocational expert:

this is light exertion, standing and walking is limited to four hours, is limited to frequent pushing and pulling with bilateral lower extremities. As far as posturals are concerned we have can never climb any ladders, ropes or scaffolds, can occasionally climb ramps and stairs, can occasionally stoop, occasionally crouch, balance is frequently, as well as kneeling and crawling, frequently. No limits on the use of hands or arms. As far as environmental is concerned this individual should avoid hazards, operating hazardous machinery. So avoid operating hazardous machinery like -- the obvious of course is the tow motors, booms, cranes and things like that.

16

(Tr. 90).  The hypothetical individual also had no mental limitations.  (*Id.*).

The VE testified the hypothetical individual would be able to perform past work as a unit clerk, performed at the sedentary level, and as a reservation clerk, performed at the sedentary level.  (Tr. 91).

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work

17

activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.     SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.

2.      The claimant has not engaged in substantial gainful activity since June 24, 2011, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.      The claimant has the following severe impairments: osteoarthritis in the knees, diabetes mellitus, degenerative disc disease of the lumbar spine, arthropathy and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except standing/walking is limited to 4 hours; is limited to frequent push/pulling with bilateral lower extremities; never climb any ladders, ropes, or scaffolds; can occasionally climb ramps and

18

stairs; can occasionally stoop or crouch; balance is frequently as well as kneeling and crawling frequently; no limits on the use of hands or arms; avoid operating hazardous machinery; and she has no mental limitations.

6.   The claimant is capable of performing past relevant work as a unit clerk and reservation clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from June 24, 2011, through the date of this decision (20 CFR 404.1520(1) and 416.920(1)).

(Tr. 14-28).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

19

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

20

(7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.    First Assignment of Error: Treating Physician Rule

Plaintiff maintains that the ALJ erred by deciding to afford less than controlling weight to the opinion of her treating physician Dr. Murphy.  A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[2]

---

[2]      Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the

21

If the ALJ determines a treating source opinion is not entitled to controlling weight, "theALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[3]

---

treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

[3] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

In this case, Plaintiff's treating physician, Dr. Murphy, produced three separate functional capacity evaluations ("FCE") of Plaintiff, dated August 31, 2012, March 7, 2013, and November 19, 2014.  These FCEs describe Plaintiff's functional limitations with respect to lifting/carrying, standing/walking, sitting, and postural activities, among other things.  Dr.

---

§ 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id*.  § 404.1527(c)(6)."  *Gayheart*, 710 F.3d at 376.

Murphy also produced a letter dated May 16, 2012 stating that Plaintiff had been unable to work because of chronic pain, diarrhea, and the need for assistance with using the toilet.

The ALJ addressed Dr. Murphy's opinions as follows:

> The case file contains three medical source statements from Pamala Murphy, M.D. (Exhs. 16F, 19F, 22F). On August 31, 2012, Dr. Murphy opined that the claimant can lift/carry 8 pounds occasionally and 5 pounds frequently; stand/walk for a total of one hour of an 8-hour workday and sit for 3 hours; rarely perform postural activities; needs extra rest periods; and needs an at-will sit/stand option. (Exh. 16F). On March 7, 2013, Dr. Murphy opined that the claimant can lift/carry 10 pounds occasionally and 5 pounds frequently; stand/walk for a total of 30 minutes of an 8-hour workday and sit for 3 hours; rarely perform postural activities ; needs extra rest periods of 4 hours on an average day; and needs an at-will sit/stand option. (Exh. 19F) On November 19, 2014, Dr. Murphy opined that the claimant can lift/carry 10 pounds occasionally and 5 pounds frequently; stand/walk for a total of one hour of an 8-hour workday and sit for one hour; rarely perform postural activities; and needs an at-will sit/stand option. (Exh. 22F)

The ALJ afforded Dr. Murphy's opinions less than controlling weight, reasoning as follows:

> I give these opinions some weight because Dr. Murphy is the treating physician. However, I do not give them controlling weight for several reasons. First, some of her limitations appear inconsistent and imprecise. For example, in the November 2014 statement, she opines that standing and walking are limited to a total of one hour in the day, but said the claimant could stand/walk without interruption for one hour, which seems inconsistent. Similarly, she said the claimant was limited to sitting only one hour maximum, yet one hour without interruption. Second, the limitations are extreme and inconsistent with the evidence as a whole including the objective medical evidence, clinical findings on examination (including the recent physical therapy examination showing intact sensation and showing good to normal lower extremity strength (Exh. 26F)), conservative course of treatment, and the claimant's "independent" activities of daily living.

(Tr. 27).

Plaintiff maintains that the above reasoning runs afoul of the treating physician rule, first because the ALJ addressed only the November 2014 FCE and ignored the other two FCEs and the May 2012 letter. The Court disagrees. Plaintiff provides no support for the idea that in order for an ALJ's reasons to be "good reasons" an ALJ must specifically address each and

every aspect of a treating physician's opinion or opinions.  The standard, as addressed above, is not so rigid.  Instead, an ALJ must provide reasons that are "'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p).  Thus, insofar as the ALJ did not address every specific detail of each FCE, the ALJ did not err.  Additionally, Plaintiff is incorrect that the ALJ "ignored" the FCEs dated August 31, 2012 and March 7, 2013.  As demonstrated by the quoted language above, it is apparent that the ALJ considered all three FCEs, as she described the limitations set forth in all of them.  (Tr. 27).  Plaintiff's claim that the ALJ ignored two of Dr. Murphy's opinions is rejected.[4]

Further, the ALJ set forth two reasons for affording the opinions less than controlling weight: (1) the limitations "appear inconsistent and imprecise"; and (2) "the limitations are extreme and inconsistent with the evidence as a whole."  Having reviewed the record and the ALJ's decision in its entirety, the Court is convinced that these reasons are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Rogers*, 486 F.3d at 242.  First, the Court agrees that the three FCEs considered together are inconsistent and imprecise.  The 2012

---

[4]    While the ALJ did not mention Dr. Murphy's letter dated May 16, 2012, the letter does not amount to a medical opinion because it does not assess any specific functional limitations.  Instead, the letter states in conclusory fashion that Plaintiff "has not been able to work" due to various medical conditions.   An ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).  The ALJ did not err by failing to mention the letter.

25

FCE shows that Plaintiff can sit for three hours total (without interruption for one hour); the 2013 FCE shows that Plaintiff can sit for three hours total (for 30 minutes without interruption); and the 2014 FCE shows that Plaintiff can sit for one hour total (for one hour without interruption).  On the other hand, the 2012 FCE shows that Plaintiff can stand/walk for one hour total (without interruption for fifteen minutes); the 2013 FCE shows that Plaintiff can stand walk for 30 minutes total (without interruption for 10 minutes); and the 2014 FCE shows that Plaintiff can stand/walk for one hour total (without interruption for one hour).

The three sets of limitations are difficult to reconcile, since, based on the FCEs, the total amount of time Plaintiff is able to sit seems to have worsened from 2012 to 2014, while the amount of time she can sit without interruption has improved.  Further, although the ability to sit worsened overall, her ability to stand/walk also appears to have improved.  Plaintiff offers no evidence that would explain these inconsistencies, and it is not readily apparent based on the record why the degree of Plaintiff's limitations, as described by Dr. Murphy, seemed to fluctuate.  Nor is it apparent, assuming the ALJ had fully accepted Dr. Murphy's opinion, how the ALJ should have interpreted the fluctuations or how she should have incorporated the fluctuating limitations in the RFC analysis.  In the Court's view, the ALJ reasonably concluded that the limitations, being "imprecise and inconsistent," should be afforded less than controlling weight.[5]

---

[5]    As an example of how the limitations are inconsistent, the ALJ asserted that the limitations in the 2014 FCE are inconsistent because Plaintiff was limited, on the one hand, to standing/walking for one hour total in an eight hour period, but, on the other, she was able to stand/walk for an hour without interruption.  Similarly, the ALJ found it inconsistent that Ms. Blair was able to sit for an hour total in an eight hour period and also able to sit for an hour without interruption.

As part of her second reason, the ALJ pointed out that the limitations are "inconsistent" with a physical therapy evaluation which took place around the time of most recent FCE from November 2014.  The physical therapy examination indicates that Plaintiff's "[d]aily activities include independence with all ADLs [activities of daily living]" (Tr. 2312); that she is independent in transfers of sit to stand, stand to sit, and sit to supine (Tr. 2315); that she has intact sensation (Tr. 2316); that her lower extremity strength was good (ranging from 4/5 to 5/5); and that conservative treatment was recommended (Tr. 2317).  This evidence, being reasonably inconsistent with the FCEs, forms a valid basis for discounting Dr. Murphy's opinions.

Further, the ALJ noted that the limitations are inconsistent with the evidence as a whole.  Indeed, the administrative decision includes a lengthy discussion of the record, and it highlights evidence showing that Plaintiff's impairments were not as severe as Dr. Murphy opined.  For instance, as described by the ALJ, despite Plaintiff's history of degenerative disc disease, a June 27, 2011 physical examination revealed normal strength, reflexes, and sensation; her heel to toe gait was normal; and her straight leg raise test was negative.  (Tr. 22, 712-13).  Other treatment records consistently show five out five strength and full range of motion in all extremities with normal sensation.  (Tr. 29, 1043, 1583, 1706-07, 1772).  While Plaintiff claims the ALJ failed to discuss Plaintiff's alleged need for an assistive device, review of the administrative decision proves otherwise.  The ALJ specifically noted that "there are instances in

--------

The Court finds that the two examples provided by the ALJ are not entirely convincing and that, perhaps, the ALJ should have taken greater care to articulate how the limitations were inconsistent.  This deficiency translates into a bit of a close call for this Court, but given that the ALJ clearly reviewed all three FCEs, noted that the limitations were "inconsistent," and, as discussed in the pages that follow, provided additional reasons and support for discounting Dr. Murphy's opinion, the Court is persuaded that no error occurred.

27

the record to indicate the claimant ambulates with an assistive device." (Tr. 23). However, the ALJ also found evidence showing that Plaintiff could ambulate independently. For instance, the ALJ pointed out that on December 27, 2012, Plaintiff's nurse noted that she "ambulates with no gait disturbance." (Tr. 22-23, 1796). The ALJ also pointed out instances of Plaintiff engaging in all activities of daily living. (Tr. 23). There is also evidence that Plaintiff exercised on a treadmill and attended Zumba classes. (Tr. 25, 2217).

Dr. Murphy's opinions were based, in part, on Plaintiff's diagnosis of diabetic neuropathy. Plaintiff contends that the ALJ erred by failing to adequately recognize and address her diabetic neuropathy diagnosis, but the Court's review of the administrative decision shows that the ALJ did consider Plaintiff's diabetic neuropathy. The ALJ noted that "review of the record shows that the claimant has a history of uncontrolled type II diabetes with neurological manifestation." (Tr. 20). The ALJ discussed at length evidence showing that the symptoms of Plaintiff's diabetes, including diabetic neuropathy, were exacerbated by her routine noncompliance with medication and diet. (Tr. 20-22). Further, the ALJ cited evidence showing that when she was compliant, her symptoms improved. (Tr. 21-22).

Plaintiff also maintains that the ALJ erred when she failed to analyze Dr. Murphy's assessment that Plaintiff required a sit/stand option. As already mentioned, Plaintiff cites no law requiring the ALJ to specifically address each and every aspect of a treating physician's opinion or opinions. Instead, an ALJ must provide reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d 242. Here, given the above

evidence, it is clear why the ALJ discounted Dr. Murphy's opinion as a whole and disregarded the sit/stand option specifically.

In sum, Plaintiff's first assignment of error has no merit.

**B.      Second Assignment of Error: Whether the ALJ improperly addressed Plaintiff's noncompliance with recommended treatment**

Plaintiff argues that the ALJ failed to properly apply Social Security Ruling 82-59 when she considered evidence of Plaintiff's noncompliance with her recommended treatment. Pursuant to SSR 82-59, "[i]ndividuals with a disabling impairment which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, unless there is a justifiable cause for the failure to follow such treatment."  In order to determine whether the claimant has "failed to follow prescribed treatment," an ALJ must consider four criteria described in SSR 82-59.[6]

Here, Plaintiff is correct that the ALJ did not consider the criteria under SSR 82-59. However, consideration of the criteria was not required, because SSR 82-59 does not apply in this case.  A finding of disability is a prerequisite to the application and Social Security Ruling

---

[6]      An ALJ may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist: (1) The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; (2) The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; (3) Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and (4)the  evidence of record discloses that there has been refusal to follow prescribed treatment.  Soc. Sec. Ruling 82-59.

82–59.  As stated by the Sixth Circuit, "[F]ailure to follow prescribed treatment becomes a determinative issue only if the claimant's impairment is found to be disabling under steps one through five and is amenable to treatment expected to restore [his] ability to work." *Hester v. Sec'y of Health & Human Servs.*, 886 F.2d 1315, 1989 WL 115632, at *3 (6th Cir.1989)).  In this case, it is undisputed that there was no finding of disability.  Therefore, Plaintiff's second assignment of error is rejected.

Finally, insofar as Plaintiff's second assignment of error can be construed as a challenge to the ALJ's credibility determination, it is also rejected.  An ALJ may use evidence of noncompliance to assess a plaintiff's credibility.  *See, e.g., Wilson v. Comm'r of Soc. Sec.*, No. 08-11925, 2009 WL 3270592, at *15 (E.D. Mich. Sept. 30, 2009).  Here, the ALJ's determination that plaintiff was noncompliant with recommended treatment is supported by the record, as numerous treatment records demonstrate that Plaintiff routinely failed to take her medications as prescribed and to adhere to her recommended diabetic diet.  (Tr. 746, 738, 720, 716, 1512, 843, 961, 907, 897, 899, 893, 1219, 1232, 1687, 1718, 1758, 1763, 1806, 2234, 1975).

In sum, Plaintiff's second assignment of error has no merit.

//

//

//

//

//

//

30

## VII.  CONCLUSION

For the foregoing reasons, it is recommended that the Commissioner's final decision be

AFFIRMED.


                                  *s/Jonathan D. Greenberg*
                                  Jonathan D. Greenberg
                                  United States Magistrate Judge

Date: February 23, 2016

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

31